UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EUGENE PERKINS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) )   Case No. 4:23CV420 HEA |
| DERRICK FRYE, | ) ) ) |
| Defendant. | ) ) |

**OPINION, MEMORANDUM AND ORDER**

This matter is before the court on Defendant Derrick Frye's Motion for Summary Judgment, [Doc. No. 7]. Plaintiff has responded to the motion. For the reasons articulated below Defendant's Motion will be granted.

**Facts and Background**

Plaintiff styles his action against Defendant Frye as a "wrongful death" claim and asserts it is brought pursuant to RSMo. § 537.080(1). Despite Plaintiff's characterization, in addition, the Petition alleges Frye's use of force was unreasonable and violative of the Fourth and Fourteenth Amendments to United States Constitution – allegations which assert a Fourth Amendment excessive force claim for unreasonable use of force.

Generally, on a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. See *Emerald Pointe, LLC v. Taney Cnty.*, 78 F.4th 428, 432 (8th Cir. 2023). Here, Plaintiff failed to

adequately respond to the Defendant's Statement of Uncontroverted Material Facts ("SUMF") as required by Local Rule 4.01(E):

> Every memorandum in opposition [to a motion for summary judgment] must be accompanied by a document titled Response to Statement of Material Facts, which must be separately filed using the filing event "Response to Statement of Material Facts." The Response must set forth each relevant fact as to which the party contends a genuine issue exists. The facts in dispute shall be set forth with specific citation(s) to the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from the moving party's Statement of Uncontroverted Material Facts.

See also Fed. R. Civ. P. 56(c).

While Plaintiff did submit a Response to Defendants' SUMF, Plaintiff's response does not provide specific citations to the record to statements he disputes. To the extent Plaintiff's responses are applicable, they are incorporated in the factual background. Likewise, the Court will also include facts from Plaintiff's response to the extent they are material and supported by the record.

On July 20, 2017, Derrick Frye was a commissioned law enforcement officer and detective with the City of St. Louis Police Division ("SLMPD")) assigned to the Anti-Crime Task Force.

On the evening of July 20, 2017, while Detective Frye was on duty and wearing a department-issued police vest clearly and visibly emblazoned with the word "POLICE," Detective Marcus Bush advised Detective Frye and other officers of the Anti-Crime Task Force via radio that he observed a white Nissan Murano

parked on the lot of a gas station at the southeast corner of Natural Bridge and Goodfellow.

The temporary tag on the white Nissan Murano matched that of a white Nissan Murano that had been used to assault law enforcement officers the day prior – at which time a white Nissan Murano matching the exact description of that Detective Bush observed had attempted to strike a police car during a police pursuit by the North County Police Co-Operative, but the white Nissan Murano escaped. North County officers had obtained and broadcast the temporary tag of the white Nissan Murano during the pursuit the day prior and conveyed that information to the Anti-Crime Task Force such that the Anti-Crime Task Force was able to determine the temporary tag was a match. A white Nissan Murano matching the general description of that Detective Bush observed had also been reported stolen. All of this this information was conveyed to Detective Frye and to other detectives over the radio via the common covert channel.

As a result of the information that the vehicle was wanted for assault on a law enforcement officer, had recently fled from police, and was reasonably believed to have been stolen, detectives of the Anti-Crime Trask Force set up on Natural Bridge to the East and West and on Goodfellow to the North and South and prepared to deploy spike strips.

The white SUV left the parking lot and proceeded north on Goodfellow –

at which time Detective Mickey Christ deployed spike strips and successfully spiked the vehicle's tires. Detective Ellis and Detective Frye were following the vehicle just before it spiked. Just after the vehicle was spiked, Detective Ellis and Detective Frye activated their emergency lights and sirens to advise the individuals in the vehicle that the police were behind them and to compel them to pull over. The vehicle did not stop or yield, and instead accelerated at a high rate of speed and almost struck another vehicle. Due to the high rate of speed and erratic driving and dangerous maneuvers the vehicle was conducting, Detective Ellis and Detective Frye temporarily lost sight of the vehicle.

 Shortly thereafter, Detective Frye saw the vehicle as he and Detective Ellis travelled North on Goodfellow. The vehicle had crashed into a concrete light pole near the Northwest corner of Goodfellow and Lilian and came to rest in an adjacent restaurant parking lot. As Detective Ellis and Detective Frye pulled up to the vehicle, two black males exited the vehicle and ran north through the restaurant parking lot to an alley running East and West located just North of the restaurant. Detective Ellis and Detective Frye exited their police vehicle to pursue on foot. When the suspects reached the alley, one ran East through the alley, and one ran West through the alley.

Detective Ellis pursued the individual running east on foot. Detective Frye pursued the individual running west on foot. This individual was later identified as Isaiah Perkins.

As Detective Frye pursued Perkins, Detective Frye observed that Perkins' left hand was free and swinging back and forth, but his right arm was bent and pinned close to his body with his hand in front of him. Due to Detective Frye's training and experience chasing people with firearms, Detective Frye believed Perkins to be armed.   Detective Frye loudly alerted Perkins that he was the police and ordered Perkins to stop running. However, Perkins did not comply and continued running.

After Perkins had turned North on Goodfellow, and as Detective Frye got closer to him, Detective Frye again ordered Perkins to stop and, when Perkins did not, Detective Frye deployed his Department issued taser. At least one prong struck Perkins in the back, and he stumbled, but the taser proved ineffective and Perkins continued to run.

Perkins then turned East on Laura. Very shortly thereafter, Detective Matthew Burle deployed his Department issued taser at Perkins. But, as Perkins ran, he reached over his back with his hand, removed one of the taser prongs from his back, and ran Northeast across Laura toward a gangway between 6173 and 6177 Laura Ave. As Perkins ran toward the gangway, Detective Burle saw what

5

looked like the butt of a gun and Detective Frye heard Detective Burle yell that Perkins was armed with a gun.

As Perkins ran Northeast across Laura toward a gangway between 6173 and 6177 Laura Ave, Detective Frye observed a gun in Perkins' right hand. Detective Frye loudly ordered Perkins to drop the gun, but Perkins did not and proceeded to run through the gangway between 6173 and 6177 Laura Ave. Detective Burle testified at the time Perkins was running up the Hill toward the gangway he can't recall Perkins having a gun. Additionally, he testified he could not see Perkins with a gun because Detective Frye was standing in front of him blocking Burle's view.

Perkins reached a chain link fence in the gangway and slowed down as he neared the fence. Perkins carefully climbed the chain link and, the entire time he climbed the chain link, he maintained possession of the gun in one hand and used his other hand to climb. At that time, Detective Frye found it extremely odd and concerning that Perkins did not drop the gun in order to climb with two hands as opposed to one. Detective Frye also found it odd and concerning that Perkins did not previously throw the firearm from the vehicle when he was fleeing, that he did not drop the gun after he was struck with a taser twice, and that he refused repeated commands to drop the gun.

Just after Perkins finished climbing the chain link, he stopped running.

With the gun still in his right hand, Perkins then turned and began to point the gun at Detective Frye with the gun extended over a metal trash can located just on the other side of the chain link.

Detective Frye saw the barrel of the gun as Perkins turned the gun directly toward Detective Frye and pointed the barrel of the gun at Detective Frye, at which time Detective Frye believed Perkins posed an imminent threat of serious harm to him. Detective Frye also knew that Detective Burle was in the area just behind him at this time.

Believing Perkins was going to shoot him and having no available cover, Detective Frye dropped to the ground in an attempt to avoid Perkins' line of fire and fired his department issued handgun at Perkins in quick succession as he was falling to the ground until the threat Perkins posed to Detective Frye had ceased. Detectives Burle and Carlson recollect that both Frye and Perkins fell at approximately the same time.

As Detective Frye fired, Perkins dropped to the ground and landed on his left side. Then, while on the ground, Perkins reached out with his right hand to the east toward the area behind the trash can. When Perkins reached out with his right hand to the east toward the area behind the trash can, Detective Frye believed Perkins either still had the gun in his hand or was reaching for the gun that he had in his hand when Detective Frye fired so that Perkins could not use it against him.

7

So, Detective Frye began to point his firearm at Perkins again but did not fire because he could not see whether Perkins was still armed. Detectives Carlson and Burle testified that Frye fired all his shots while standing in front of Perkins. Other detectives arrived very shortly thereafter, secured the scene, and called Emergency Medical Services.

The gun that Perkins had turned towards Detective Frye was recovered from on top of the lid of the metal trash can that Perkins had extended the gun over.

Detective Frye had chased many suspects with firearms and never before shot anyone. Typically, fleeing suspects that have crashed in a vehicle leave their guns in the car, throw their guns from the car before they crash, or throw their guns, for example, in sewers, on roofs, or in dense foliage shortly after fleeing from a vehicle. The fact that Perkins made no attempt to discard his gun even after running and being struck by tasers twice, refused to drop the gun, climbed a chain link barrier while holding it, and turned the gun towards Detective Frye contributed to Detective Frye's belief that Perkins intended to use the gun against him.

## Summary Judgment Standard

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the non-moving party, indicates that no genuine [dispute] of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 654 (8th Cir.

8

2007); Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id.* "The basic inquiry is whether it is so one-sided that one party must prevail as a matter of law." *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and citation omitted). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citation omitted). Once the moving party has met its burden, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citation omitted).

    To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'" *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)). The nonmoving party may not merely point to unsupported self-serving allegations but

must substantiate allegations with sufficient probative evidence that would permit a finding in his or her favor. *Wilson,* 62 F.3d 237, 241 (8th Cir. 1995). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson,* 477 U.S. 242 at 252; *Davidson & Associates v. Jung,* 422 F.3d 630, 638 (8th Cir. 2005). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines,* 2008 WL 2609197 at *3 (8th Cir. 2008).

## Discussion

Defendant moves for summary judgment based on, among other bases, qualified and official immunity. "Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Burbridge v. City of St. Louis*, 2 F.4th 774, 780 (8th Cir. 2021) (internal quotation marks and citation omitted). "Once a defense of qualified immunity is raised, a plaintiff must offer 'particularized' allegations of unconstitutional or illegal conduct." *Conrod v. Davis*, 120 F.3d 92, 95 (8th Cir. 1997) (citing *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987)). The Supreme Court has emphasized that "qualified immunity represents the norm," *Harlow v.*

10

*Fitzgerald*, 457 U.S. 800, 807 (1982), and its protections extend to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When analyzing qualified immunity claims, courts consider two crucial factors: (1) whether the alleged facts demonstrate that the public official's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. See *LaCross v. City of Duluth*, 713 F.3d 1155, 1157 (8th Cir. 2013). A summary judgment motion based on qualified immunity must be denied if "(1) the evidence, viewed in the light most favorable to [Perkins], establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable officer would have known that his actions were unlawful." *Banks v. Hawkins*, 999 F.3d 521, 524 (8th Cir. 2021), cert. denied, 142 S. Ct. 2674 (2022). Conversely, if either prong is not established, qualified immunity applies, and summary judgment must be granted. *Aden v. City of Eagan, Minnesota*, No. CV 20-1508 (JWB/TNL), 2023 WL 6387308, at *5 (D. Minn. Sept. 29, 2023).

"A right is clearly established if its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Mitchell v. Shearrer*, 729 F.3d 1070, 1076 (8th Cir. 2013) (quoting *Anderson*, 483 U.S. at 640). There is no requirement that "the very action in question has

previously been held unlawful," but for an official action to violate a clearly established right, the unlawfulness of that action must be apparent in light of pre-existing law. *Anderson*, 483 U.S. at 640. "In other words, the right violated must have been established 'beyond debate.' " *Mendoza v. U.S. Immigration & Customs Enf't*, 849 F.3d 408, 417 (8th Cir. 2017) (citations omitted). Clearly established law "should not be defined at a high level of generality," but instead "must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and citations omitted). "The plaintiff bears the burden of proving that the law was clearly established." *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013) (citation omitted). If a defendant raises a qualified immunity defense in a summary judgment motion, "the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013).

In a Fourth Amendment excessive force case, the Court's role is to assess, "from the perspective of a reasonable officer on the scene, whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Franklin ex rel. Franklin v. Peterson*, 878 F.3d 631, 635 (8th Cir. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted)). "The use of deadly force is reasonable where an officer has probable cause to

12

believe that a suspect poses a threat of serious physical harm to the officer or others." *Ellison v. Lesher*, 796 F.3d 910, 916 (8th Cir. 2015) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)). However, deadly force is not justified where a person "poses no immediate threat to the officer and no threat to others." *Franklin,* 878 F.3d at 635 (citations omitted). As held by the Eighth Circuit, "[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun." *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) (citation omitted).

The Court finds that Detective Frye is immune from liability under the principles of qualified immunity. Plaintiff's sole argument against the application of qualified immunity is that Detective Burle did not see Perkins with a gun in his hand. Burle's testimony, however, fails to establish Perkins did *not* have a gun, rather, Burle testified that he could not see if Perkins had a gun because Frye was blocking Burle's view of Perkins, as Frye was standing in front of Burle. Relying solely on Burle's testimony is insufficient to overcome the uncontroverted evidence that both Frye and Carlson testified to seeing a gun in Perkins' hand. Whether Frye definitively established that Plaintiff had a weapon pointed at him before he fired upon Perkins is not a material issue to determine whether Frye is entitled to qualified immunity. The issue is whether this Defendant acted

reasonably under the circumstances.

The uncontroverted facts establish that Frye acted reasonably under the circumstances. He had probable cause to believe that Plaintiff posed a risk of harm to the detectives when he shot at Plaintiff. There is no material dispute that Perkins had a gun and was pointing it at Frye, that Perkins was fleeing from the detectives, that he did not respond to the detectives' demands to surrender, that the lesser force of the tasers failed to stop Perkins. The facts show that instead of heeding these commands, Plaintiff pointed a gun at Frye. In these circumstances, Defendant's use of force, even deadly force, against a fleeing suspect whom he believed was a threat to himself, his fellow officers, and the public was reasonable. Frye acted reasonably, there is no underlying constitutional violation, and he is entitled to qualified immunity. Because Plaintiff has failed to establish any issue of material fact as to his Fourth Amendment Excessive Force Claim, Fry is entitled to judgment as a matter of law on the Fourth and Fourteenth Amendment claims.

**Official Immunity**

Defendant argues that he is entitled to summary judgment on Plaintiff's wrongful death claim under the official immunity doctrine. In Missouri, "[t]he official immunity doctrine provides that public officials acting within the scope of their authority are not liable in tort for injuries arising from their discretionary acts or omissions." *Seiner v. Drenon,* 304 F.3d 810, 813 (8th Cir. 2002) (quoting

*DaVee v. Mathis*, 812 S.W.2d 816, 827 (Mo. Ct. App. 1991)). Official immunity protects police officers from liability when they execute a warrant, draw or fire a weapon, or draw and point a weapon at a suspect as discretionary acts. *Id*. (citing *Bachmann v. Welby*, 860 S.W.2d 31, 33 (Mo. Ct. App. 1993) and *Miller v. Smith*, 921 S.W.2d 39, 46 (Mo. Ct. App. 1996)).

Defendant has established that he is immune from liability as to Plaintiff's wrongful death claim under the official immunity doctrine. Plaintiff makes no arguments and cites no evidence indicating that official immunity should not apply to Defendant. Plaintiff has presented no evidence of bad faith or malice which could take Defendant's actions outside of his official immunity defense. Defendant's act of drawing and firing his weapons are discretionary acts for which he is afforded official immunity. The Court finds that there is no dispute of material fact regarding the wrongful death claim, and Defendant Frye is entitled to judgment as a matter of law.

## Conclusion

Based on the foregoing analysis, Defendants Frye is entitled to summary judgment on each of Plaintiff's claims.

Accordingly,

**IT IS HEREBY ORDERED** that that Defendant Frye's Motion for Summary Judgment [Doc. No. 7] is **GRANTED.**

A separate judgment is entered this same date.

Dated this 28th day of March, 2024.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE